**Elsie JOHNSON and Thomas A. Nokes,
Plaintiffs–Appellants,**

v.

**Donald CRAYCRAFT, Defendant–
Appellee.**

Court of Appeals of Tennessee,
Eastern Section.

June 30, 1995.

Application for Permission to Appeal
Denied by Supreme Court
Nov. 6, 1995.

J. Randall Shelton, Morristown, for appellants.

Clinton R. Anderson, Morristown, for appellee.

## OPINION

SUSANO, Judge.

Elsie Johnson and her only son, Thomas A. Nokes, brought suit against Donald Craycraft (Craycraft), Johnson's longtime acquaintance, for an accounting of Johnson's assets allegedly entrusted to Craycraft's care. The Chancellor, sitting without a jury, concluded that the proof failed to establish that a confidential relationship existed between Johnson and Craycraft, tacitly finding that there was no basis for invalidating money and property transfers from Johnson to Craycraft and his wife. He denied the requested accounting. Nokes appeals, raising one issue: Did a confidential relationship exist between Johnson and Craycraft and his late wife such that Craycraft must rebut by clear and convincing evidence the presumption of undue influence and unfairness in transactions in which he eventually took control of essentially all of Johnson's assets?

The appellee Craycraft raises four issues, three of which are subsumed in the appellant's issue. His fourth issue is whether T.C.A. § 28–3–105, the statute of limitations applicable to the tort of conversion, bars this suit.

### I

Johnson, Craycraft, and the latter's wife [1] were friends for many years. As early as 1977, Johnson placed Craycraft's name as well as her own on several bank accounts that she opened with her funds. In 1984, she caused his name along with her own to be reflected as the owners of her home in Massachusetts. In 1985, Johnson executed a will leaving her estate to the Craycrafts.

In 1987, Johnson, then 78, sold her home in Massachusetts and moved to Morristown so she could live near the Craycrafts. In August, 1987, before her move, she purchased a house in Morristown for $60,500 on the strength of Craycraft's recommendation. Despite paying the entire purchase price out of her personal funds, she took only a life estate in the property. The remainder interest was placed in the names of Mr. and Mrs. Craycraft. Before moving to Morristown, Johnson was advised by her Massachusetts physician that she should not live alone. The Craycrafts arranged for her to move into a retirement center in the Morristown area. She later moved to a nursing home. She never occupied the Morristown house purchased in August, 1987.

On February 23, 1988, Johnson granted each of the Craycrafts a broad unrestricted power of attorney. That same day she transferred her life estate in the Morristown property to the Craycrafts by a quitclaim deed. The Craycrafts paid no consideration. The Craycrafts sold the property one year later

1. Pauline Craycraft died before this suit was filed.

for $61,000, retaining the proceeds for themselves.

In connection with her move to Morristown, Johnson redeemed certificates of deposits totaling $283,701.47. Craycraft arranged to have these funds deposited in a bank in Morristown in the names of "Elsie M. Johnson or Donald Craycraft." He also opened another checking account for Johnson out of which her incidental expenses were thereafter paid.

All checks drawn on Johnson's Morristown bank accounts were written by Craycraft. In September, 1987, he wrote a $60,000 check on the main account to purchase the Morristown house. Subsequently, he wrote checks on that account to pay Johnson's expenses at the retirement home. Also in September, Craycraft wrote a $200,000 check against the main account which he used to purchase a six-month certificate of deposit at a bank in Morristown. It was issued in both their names. When the certificate matured in March, 1988, the money was put into a new certificate in Craycraft's name only. This was ostensibly done at Johnson's request. In April, 1990, Craycraft wrote a check to cash for $15,000 on the main checking account. He testified that Johnson made a gift of this money to his wife.

In February, 1991, Nokes came to Morristown to visit his mother. The next month he arranged to take her to Sarasota, Florida, where he lived. On March 15, 1991, she executed a new will leaving all of her property to Nokes. On March 22, 1991, she signed a "Power of Attorney" giving Nokes authority to make all financial and health care decisions for her and authorizing him to serve as her conservator if necessary. On May 14, 1991, she signed a letter to Craycraft requesting "a full accounting of all money that has been entrusted to you (whether the money be in my name or your name)" and asking that all money held on her behalf be transferred to her new account in Florida. Craycraft never responded to her request.

Johnson and Nokes filed suit against Craycraft on September 20, 1991, alleging breach of fiduciary duties and requesting an accounting and a "judgment against Donald Craycraft for any sums found to be due ...

from him." They requested both compensatory and punitive damages. Craycraft filed an answer challenging Johnson's competence and denying breach of any duty owed to Johnson. Upon Johnson's death on November 29, 1991, Nokes obtained letters of administration and an order admitting the 1991 will to probate in Florida. Craycraft contested the 1991 will, but a Florida trial court held that Nokes had rebutted a presumption of undue influence and denied Craycraft's petition.

Nokes filed a motion in the instant case to revive his mother's suit in his name as her personal representative. Following the outcome of the Florida will contest, the Chancellor ordered that Johnson's action be revived in her son's name.

At the trial of this case, Nokes called Craycraft as his only live witness. With the exception of a bank teller who testified by deposition as to the issuance of the $200,000 certificate of deposit in March, 1988, Craycraft was the only witness who testified as to dealings between Johnson and the Craycrafts. Under direct examination, Craycraft testified that the opening balance in Johnson's main bank account in Tennessee upon her arrival was $283,701.47. He testified that, although he never placed any of his own funds in the account, it was nevertheless "[p]resumably, hers and mine" due to both names being placed on the account. He further stated that this main account was used to pay for her medical and retirement home bills, which ranged from about $1,500 per month up to "two thousand and better" per month.

Craycraft testified that Johnson quitclaimed her interest in the property to the Craycrafts in 1988 without any payment, but asserted that "I knew nothing about it until she told me what she wanted to do." Craycraft admitted reselling the house and placing the sale proceeds in his own account, but claimed that this was appropriate given that "half of the money, legally, was mine from the sale [proceeds] of the house in Massachusetts [titled in both names]." He also acknowledged the existence of the Durable Powers of Attorney given by Johnson to him

and his wife, but stated that "[t]he power of attorney ... it was never used to my knowledge."

Craycraft acknowledged writing a $200,000 check on the main account in September, 1987, in order to purchase a six-month certificate of deposit. The certificate was held in both names, but the interest was attributed to Johnson for income tax purposes. He further acknowledged that, when the certificate was renewed for a one year term in March, 1988, only his name was put on the new certificate because, according to him, Johnson insisted that her name not appear on it. This testimony was supported by Mary Brady, a vice president of the bank issuing the certificate.

Craycraft admitted that he had written and signed a check for $15,000 payable to cash from the main account. He testified as follows:

Q: All right. In 1990, what was check 110, dated 4/13/90, again, written right before the income tax deadline, written to cash in the amount of $15,000.00 for?

 * * * * * *

A: That amount was given to my wife by Mrs. Johnson, and the amounts, I have the checks of where they went.

Q: Okay. Mrs. Johnson gave your wife $15,000.00?

A: That is correct.

Q: Was it just coincidence that it was right there at income tax time?

A: Absolute [sic], and knew nothing about it until she said, do it.

Q: All right. Did you write the check?

A: Yes, I did.

Q: Where did you put the money?

A: I put it in my wife's and mine [sic] account.

Craycraft asserted that all of the transactions with Johnson were made in accordance with her expressed wishes. He denied pressuring Johnson to quitclaim her interest in the Morristown house to the Craycrafts, and stated that he had the quitclaim deed prepared in accordance with her instructions and that she was present when the deed was prepared. He specifically denied asking

Johnson to put the $200,000 certificate in his name alone, and testified that

I said, I'd rather not have it that way. Mrs. Johnson said, this is the way I want it, that's the way it's going to be.

With regard to the $15,000 check to cash, Craycraft denied asking or influencing Mrs. Johnson to make the "gift" to his wife. He testified that

Mrs. Johnson said to me, Don, give your wife $15,000.00 out of my account. I said, huh-uh, for what? She said, I'm not giving it to you, I'm giving it to your wife, and do it. So, I did.

Craycraft further testified that he and his wife never abused Johnson's trust, and that they always acted in her best interest:

[We] [d]id everything that she needed to have done except taking her to the beauty shop. Took her to the doctors, took her to the dentist, took her to the foot doctor. Even have took her to the hair dresser. Brought her to [the attorney's] office where she asked about the quitclaim deed being made. Took her to the bank, took her out to eat when she would go. Things of that nature. Anything that she wanted to do.

Craycraft conceded that, because he lacked copies of the signature cards, he could not prove that Johnson's Morristown bank accounts were held in both names *with a right of survivorship.* He insisted, however, that "[t]hat's the way it was supposed to have been."

In his memorandum opinion, the Chancellor noted that although Johnson clearly placed great trust and confidence in the Craycrafts, there was "no evidence presented concerning the physical or mental condition of Mrs. Johnson," and "no evidence of a *confidential relationship,* in the legal sense, since there is absolutely no evidence that she was of weak mind or will, i.e., that she was dominated by Mr. Craycraft." (Chancellor's emphasis) The Chancellor noted the existence of the Durable Powers of Attorney granted by Johnson to the Craycrafts, but opined that the financial transactions attacked by Nokes "had no relation to or connection with the power of attorney." The

Chancellor next considered whether the mere existence of a power of attorney gave rise to a presumption of a confidential relationship. He opined that "there must be evidence of *domination* in addition to 'trust and confidence' before such a presumption can arise." (Chancellor's emphasis) Finding no such domination, he dismissed the suit. Anticipating the possibility of a reversal by this court, the Chancellor went on to rule, in the alternative, that, if a confidential relationship should be found to have existed, then Craycraft should be charged with $278,698 as of September 1987, and ordered to account for all income received by him on that sum as well as all expenditures made on Johnson's behalf. As a part of his alternative finding, he voided all gifts to the Craycrafts.

## II

■ We review this non-jury case *de novo*. It comes to us with a presumption of correctness that we must honor unless the evidence preponderates against the Chancellor's findings of fact that support his judgment. T.R.A.P. 13(d). No such presumption attaches to the Chancellor's conclusions of law. *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn.1993).

After this case was tried, the Supreme Court filed its opinion in the case of *Matlock v. Simpson,* 902 S.W.2d 384 (Tenn.1995). That case holds, as particularly pertinent here, that "an unrestricted power of attorney, in and of itself, creates a confidential relationship between the parties." *Id.* at 386. That "confidential relationship" is said to exist "as a matter of law." *Id.* *See also Mitchell v. Smith,* 779 S.W.2d 384, 389 (Tenn.App. 1989).

*Matlock* also clearly holds that a confidential relationship, e.g., one created by an unrestricted power of attorney, "followed by a transaction wherein the dominant party receives a benefit from the other party" gives rise to "a presumption of undue influence ... that may be rebutted only by clear and convincing evidence of the fairness of the transaction." *Id.* *Matlock* expressly overruled Tennessee precedent applying a preponderance of the evidence standard. *Id.* at 386.

## III

■ The Chancellor, deciding this case without the benefit of *Matlock,* determined, *as a matter of fact,* that no confidential relationship existed between Johnson and the Craycrafts. We agree with the Chancellor that the issue of the existence of a confidential relationship was a factual determination as to the period of time prior to February 23, 1988. *Id.* at 385. *See also Roberts v. Chase,* 25 Tenn.App. 636, 166 S.W.2d 641 (1942); *Turner v. Leathers,* 191 Tenn. 292, 232 S.W.2d 269 (1950); *Halle v. Summerfield,* 199 Tenn. 445, 287 S.W.2d 57 (Tenn.1956).

■ We do not find that the evidence preponderates against the Chancellor's findings of fact regarding the non-existence of a confidential relationship prior to February 23, 1988. As the Chancellor points out, there is no evidence in the record suggesting that Johnson was dominated by the Craycrafts. The evidence does not preponderate against the following observation of the trial court:

> As seen, although there is evidence that Mrs. Johnson relied upon Mr. Craycraft and had confidence in him, there is no evidence of a *confidential relationship,* in the legal sense, since there is absolutely no evidence that she was of weak mind or will, i.e., that she was dominated by Mr. Craycraft. Plaintiff in effect asks this court to infer that she was dominated merely because she relied extensively upon Mr. Craycraft; that the court may not do.

(Chancellor's emphasis). Since there was no showing of a confidential relationship before February 23, 1988, the facts of this case do not give rise to a presumption of undue influence. Without that presumption, and the resulting burden it casts upon the dominant party, we are left with no basis upon which to invalidate the transactions consummated prior to February 23, 1988. The Chancellor reached the correct result as to those transactions.

■ On February 23, 1988, Johnson gave each of the Craycrafts an unrestricted power of attorney. As of that date, a confidential relationship existed, *as a matter of law,* as to all transactions between Johnson and the Craycrafts. The Chancellor, in an almost

clairvoyant manner, noted that "there simply is no evidence from which this court may find that a confidential relationship existed *unless* the existence of a power of attorney created such a relationship be operation of law." (Chancellor's emphasis). Under *Matlock*, such a relationship in this case was created by operation of law.

 There is a presumption of undue influence as to all transactions between Johnson and the Craycrafts that took place on and after February 23, 1988. As to these transactions, Craycraft must show, by clear and convincing evidence, that the transactions were fair.

The most significant transaction between Johnson and either of the Craycrafts that occurred on or after February 23, 1988, was the issuance of a certificate of deposit to Craycraft in March, 1988. That certificate was funded with monies that originally belonged solely to Johnson. The Chancellor mentioned this transaction in the course of his memorandum opinion:

> In March of 1988, one month after the power of attorney was executed, a certificate of deposit in the amount of $200,-000.00, payable jointly to Mrs. Johnson and Mr. Craycraft (with right of survivorship) matured. Mr. Craycraft and Mrs. Johnson went to the Bank of East Tennessee and there talked to Ms. Mary Brady, a vice-president of the bank, concerning the renewal of that certificate. Mrs. Johnson requested that the certificate be renewed only in the name of Mr. Craycraft. According to Ms. Brady, Mr. Craycraft demurred, stating that he preferred that she not do that. Mrs. Johnson, however, was insistent. The following questions and answers in the deposition of Ms. Brady are interesting:
>
> Q: Did the Craycrafts appear to you to be exerting any sort of pressure on Elsie [Johnson] to have the C.D. changed?
>
> A: No. It would be the opposite, if anything.

Q: That Elsie was putting pressure on the Craycrafts, ma'am?

A: Yes.

Moreover, Ms. Brady did not even hint that she suspected that Mrs. Johnson was mentally deficient or incapable of making decisions on her own behalf. For whatever reason, neither attorney asked a question of Ms. Brady that touched upon the subject of Mrs. Johnson's mental acuity.

The Chancellor examined this transaction in the context of determining whether a confidential relationship existed between Johnson and Craycraft. Since he did not find a confidential relationship, he did not expressly find that the presumption of undue influence had not been overcome, although his alternative holding strongly suggests such a finding.

We find and hold that the Chancellor was in error in determining that there was no confidential relationship between Johnson and the Craycrafts as to transactions between them on and after February 23, 1988.

 The appellee contends that this case is one for conversion. He argues that the appellants' cause of action is barred by T.C.A. § 28–3–105, the three-year statute of limitations applicable to "[a]ctions for the detention or conversion of personal property." We disagree with his conclusion that this suit is time-barred.

 Assuming, without deciding [2], that this is an action for conversion, we do not find that the evidence preponderates against the Chancellor's finding that the statute of limitations of three years "had not expired by the time this suit was filed." The period of limitations began to run "from the accruing of the cause of action." *See* T.C.A. § 28–3–105. The cause of action accrued "when the plaintiff knew or reasonably should have known that a cause of action existed." *Stone v. Hinds*, 541 S.W.2d 598, 599 (Tenn.App. 1976).

 The issue of accrual of a cause of action is basically a question of fact for the trier of fact. *National Mortg. Co. v. Wash-*

---

2. The Chancellor found that the action was one for conversion:

Although at the commencement of this trial the plaintiff asserted that this was not a suit for

conversion, the court knows not how else to characterize it.

**512**

*ington,* 744 S.W.2d 574, 580 (Tenn.App.1987). By letter dated May 14, 1991, Johnson asked Craycraft for an accounting of her assets. A reasonable inference from that letter is that Johnson was unaware that Craycraft intended to exercise dominion and control over the property in question in a manner that was "inconsistent with the plaintiff's rights." *See Mammoth Cave Production Credit Association v. Oldham,* 569 S.W.2d 833, 836 (Tenn. App.1977). The evidence does not preponderate against the Chancellor's findings of fact as to the statute of limitations. The appellee's issue is found to be without merit.

The Chancellor's primary holding with respect to transactions between Johnson and the Craycrafts before February 23, 1988, is affirmed. The Chancellor will still have to examine pre-February 23, 1988, transactions in which Johnson ostensibly established joint accounts with Donald Craycraft to determine if Johnson intended to make a gift to Craycraft or rather intended merely to place his name on the accounts to facilitate his ability to utilize these assets for *her* benefit. This inquiry is necessary to determine the true ownership of certain assets when the confidential relationship commenced on February 23, 1988.

With respect to all transactions between Johnson and the Craycrafts on and after February 23, 1988, the primary holding of the Chancellor is vacated. We remand this case to the trial court so it can determine whether the presumption of undue influence created by the confidential relationship that existed on and after that date has been overcome by clear and convincing evidence of the fairness of the subject transactions; and to determine the specific relief, if any, to which Nokes is entitled. We recognize that the Chancellor held that if this court determined that there was a confidential relationship between Johnson and the Craycrafts that all gifts to the Craycrafts were voided; however, that alternative holding assumed a reversal as to all of the transactions, both those before February 23, 1988, as well as those on and after that date. Since our finding is limited to transactions on and after February 23, 1988, and since we are not sure of the underlying basis for this alternative holding,

we are not comfortable in relying upon it to finally determine this matter. We believe a remand for the indicated purpose is appropriate. Costs on appeal are taxed one-half to each party.

FRANKS and McMURRAY, JJ., concur.