IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 8, 2003 Session

## IN RE: THE ESTATE OF MERLE HALLIBURTON NEAL MYERS v. FARMERS & MERCHANTS BANK CORP., INC. BROOKSIE MYERS, DOUGLAS MYERS, JAMES MYERS

**Appeal from the Chancery Court for Stewart County**
**No. P2-158     Robert E. Burch, Judge**

---

**No. M2002-00888-COA-R3-CV**

---

After the death of their elderly mother, her sons discovered that the decedent's stepson and his wife had used a power of attorney to transfer the funds from the decedent's $20,000 CD to themselves. The decedent's son filed a petition to have the money restored to her estate. The trial court held that the CD was a valid inter vivos gift from the decedent. We reverse, because there is no evidence in the record that such a gift was ever made.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Reversed and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and DON R. ASH, SP. J., joined.

J. Runyon, Clarksville, Tennessee, for the appellant In Re: The Estate of Merle Halliburton Neal Myers.

Carrie W. Gasaway, Clarksville, Tennessee, for the appellees, Farmers and Merchants Bank, Inc. and Brooxie Myers, Douglas Myers and James Myers.

## OPINION

### I. The Facts

Since this case involves a dispute between the children and stepchildren of a decedent, we begin with a brief family history. Merle Halliburton Neal and James W. Myers married in 1958. "Ms. Merle," as she was sometimes known, was a widow with three sons from her earlier marriage, Lonnie, Michael and Bob Neal. To avoid confusion, we will also refer to her as Ms. Merle throughout this opinion. Mr. Myers had two sons from his own earlier marriage, Douglas and James Myers.

The couple lived and grew old together in Dover, Tennessee, in a house that Mr. Myers had owned prior to his marriage to Ms. Merle. Douglas Myers and his wife Brooxie[1] also lived in Dover, in a house next door to James W. and Ms. Merle. Lonnie and Michael Neal lived in Clarksville, where Lonnie operated a funeral home.

Mr. Myers died in July of 1996. He had executed a will in 1963, but it was not submitted for probate prior to the filing of the Petition from which the present case arose. The proof shows, however, that in 1994 he deeded his real property (the marital home) to his son Douglas, and that at his death, there was a $40,000 Certificate of Deposit at Farmers and Merchants Bank, held in the name of "James Myers or Merle Myers or Douglas Myers."

Douglas Myers and Ms. Merle subsequently cashed in the CD, and shared the proceeds equally. Ms. Merle purchased a $20,000 CD at the same bank with her share. The CD she purchased stated on its face that it was "POD" (meaning to be paid on death) to her three sons.

Ms. Merle was 87 years old when her husband died, and she was not in the best of health. She relied heavily on Brooxie and Douglas Myers for assistance with her daily needs. On January 5, 2000, she left the marital home and moved in with them. Later that month, she had surgery. She was diagnosed with Hodgkins Disease, and began receiving hospice care. At the suggestion of hospital personnel, Brooxie Myers had a Durable Power of Attorney prepared, which Ms. Merle signed on January 28.[2]

On March 18, 2000, Ms. Merle's son Bob Neal passed away. Brooxie Myers testified that with some trepidation, she tried to explain his death to Ms. Merle, but Ms. Merle apparently did not understand, or "didn't want to hear it." On March 20, Brooxie Myers used the power of attorney to cash Ms. Merle's $20,000 CD, and put the proceeds into an account she held jointly with her husband. Exactly one month later, on April 20, Ms. Merle passed away. She was 91.

At Ms. Merle's funeral, latent tensions between the two sides of the family came to the surface. The grandson of James W. Myers, also named James Myers, told Lonnie Neal that there was no money left in the estate, and that Lonnie and his brother would have to pay the funeral costs. He also criticized the Neals for failing to do anything to help their mother during her final illness.

On April 24, 2000, Brooxie Myers closed a checking account in AmSouth Bank with a balance of $4,000 that Ms. Merle had held jointly with Douglas Myers. There were also two CDs, POD to Ms. Merle's sons, worth about $3,000 each in a lockbox at the bank. Douglas Myers had a key to the lockbox. He liquidated the CDs, and had checks payable to Lonnie, William and the

---

[1]Most of the filings in this case spell the first name of Douglas Myers' wife as "Brooksie." But the respondents' answer declares that the correct spelling is Brooxie.

[2]The proof showed that the individual who notarized the power of attorney did not actually witness Ms. Merle signing it, and in fact never met Ms. Merle. However, the testimony of individuals familiar with her signature established to the court's satisfaction that the signature was indeed her own.

Estate of Bob Neal drafted, but after he was served with the Petition filed by Lonnie Neal, he decided to hold onto the checks.

## II. Legal Proceedings

On April 28, 2000, Lonnie Neal filed a Petition in the Chancery Court of Stewart Count asking to be made the Administrator of his mother's estate. He named as respondents Brooxie Myers, Douglas Myers, James Myers and Farmers and Merchants Bank.

The Petition recited the above facts as to the bank transactions, and asked for a restraining order to prevent the Myerses from "disposing of, encumbering, transferring, moving or otherwise hindering, any and all personal property of Decedent, or of the late James W. Myers." It also asked for a restraining order to prevent Farmers and Merchants bank from releasing funds from the Myers's account that would bring their balance to less than $20,000. The trial court issued Letters of Administration to Lonnie Neal, and granted the restraining orders.

The Myerses filed an Answer and Counter-Complaint. They declared that they were filing the will of James W. Myers for probate, and that the provisions of the will only gave Ms. Merle a one-half life interest in his money and personal property, with the remainder bequeathed to Douglas Myers at her death. They accordingly asked that all such property be declared the absolute property of Douglas Myers, and that any money in controversy be paid into the Chancery Court. An Agreed Order was subsequently filed, by which the respondents were to pay $20,000 to the Clerk and Master for deposit into an interest-bearing account, pending the disposition of the case.

The matter came to trial on March 20, 2002. Brooxie Myers testified as to the assistance she and her husband rendered to Ms. Merle after the death of James W. Myers. Among other things, Brooxie would take Ms. Merle to buy food, to the bank, to the doctor, to the drugstore, "anywhere she wanted to go." After Ms. Merle moved in with Douglas and Brooxie Myers, she needed help with bathing, dressing and feeding herself. Brooxie had the assistance of the hospice nurses, but she also had a lot to do herself. She stated that "I literally put my life on hold from January 5th until April the 29th to take care of that lady because I loved her."

Brooxie also testified that she cashed the $20,000 CD because Ms. Merle's care was physically exhausting, and she knew that she was going to have to hire a sitter. However, the proof also showed that she had access to the checking account with $4,000 in it, and, at the time she liquidated the CD, a hospice nurse had already told her that Ms. Merle didn't have long to live, and could die any day.

A hand-written letter from Ms. Merle to her son Bob Neal was entered into the record. The letter is dated Wednesday, July 1. The year is presumably 1999, because it states that "[b]eing ninety makes me realize any thing could happen to me so I am listing my assets. Please keep this confidential." She then proceeded to list the CDs discussed above, the checking account, and two insurance policies. The letter goes on to say "[t]his is to be divided equally among you three boys

after all expenses are paid," and instructs Bob to make copies of the letter for his brothers. The court later declared this letter to be Ms. Merle's holographic will

In its final order, the trial court gave great weight to the testimony of Marie Kates, a long-time friend of Ms. Merle's. Ms. Kates testified that she visited Ms. Merle during her last months, that they frequently spoke by telephone, and that Ms. Merle told her "whoever took care of her, she wanted them to have her money."

At the conclusion of the proof and after closing arguments, the trial court ruled that the respondents were estopped from asserting the will of James W. Myers, because they failed to present the will for probate in due course, and because the parties divided the $40,000 CD without reference to the provisions of the will.

However, relying upon Ms. Kates's testimony that Ms. Merle wanted those who cared for her to have her money, the court found that the transfer of funds from the $20,000 CD and from the joint checking account were valid inter vivos gifts to Brooxie and Douglas Myers. The court further found that Ms. Merle intended to give the two $3,000 CDs to the defendants, but that since these were not delivered prior to her death, they were not valid inter vivos gifts, and would pass through the estate in accordance with the holographic will. This appeal followed.

### III. An Inter Vivos Gift?

### A. The Question of Delivery

There are three essential elements that must be present for an inter vivos gift to be valid: an intention to make the gift on the part of the donor, delivery of the gift, and its acceptance by the donee. *Smith v. Smith*, 650 S.W.2d 54, 55 (Tenn. Ct. App. 1983); *State ex rel. Teague v. Home Indem. Co.*, 442 S.W.2d 276, 280 (Tenn. Ct. App. 1967). The testimony of Marie Kates may be deemed to constitute evidence of Ms. Merle's intention to make a gift to Douglas and Brooxie Myers, and there can be no doubt that Brooxie accepted the benefit, but there is no evidence in the record from which we can infer that a delivery was made.

While there are many possible ways that delivery of personal property can be accomplished, all are characterized by a voluntary and absolute surrender of dominion and control over the property by the donor to the donee. *In re Estate of Nichols*, 856 S.W.2d 397, 399 (Tenn. 1993); *Hansel v. Hansel*, 939 S.W.2d 110, 112 (Tenn. Ct. App. 1996). When a general power of attorney is involved, it can be difficult to determine when such a surrender has taken place, for by its nature, such a power gives the attorney-in-fact control over the assets of the party granting the power.

We note that among other things the power of attorney signed by Ms. Merle conveys to Brooxie Myers the power

9. To do anything I could do myself with regard to bank accounts, accounts at savings and loan institutions, credit unions and other institutions, including opening and modifying and closing such accounts and signing and endorsing checks or drafts of all kinds.

. . . .

15. To make gifts of my money or property to any person, or to lend my money or other property to any person on any terms whatsoever.

The respondents concede, however, that the execution of the power of attorney did not constitute the making of a gift to the attorney-in-fact. The power was executed at the suggestion of hospital personnel, and we cannot infer any donative intent from Ms. Merle's acquiescence and signature.

The respondents suggest instead that the gift may have been made when the transfer of the CD was accomplished. Not only is there no evidence in the record that Ms. Merle suggested to Ms. Myers that she cash the CD and take the proceeds, there is also no evidence in the record that Ms. Merle was informed of the transfer after it occurred, or that she was ever made aware of it. It thus appears to us that the only gift involved in this case was one from the attorney-in-fact to herself, a type of transfer which raises troubling questions.

## B. A Confidential Relationship

Since we have determined that there was no delivery, and thus no valid inter vivos gift to Brooxie Myers, what are we to make of Ms. Myers's use of the power of attorney given her by Ms. Merle? The creation and use of an unrestricted power of attorney establishes a confidential and fiduciary relationship as a matter of law between the party granting the power and the attorney-in-fact. *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995); *Mitchell v. Smith*, 779 S.W.2d 384, 389 (Tenn. Ct. App. 1989). The trial court in the present case correctly found there to be such a relationship between Ms. Merle and Brooxie Myers.

The existence of a confidential relationship, coupled with evidence of a transaction beneficial to the dominant party creates a presumption of undue influence, and of the invalidity of the transaction, which can be overcome only by clear and convincing evidence of the fairness of the transaction. *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995); *Smith v. Smith*, 102 S.W.3d 648, 653 (Tenn. Ct. App. 2002); *Johnson v. Craycraft*, 914 S.W.2d 506, 510 (Tenn. Ct. App. 1995). The transfer of the funds from the CD to the attorney-in-fact certainly benefitted Brooxie Myers. It also had the effect of depriving Ms. Merle of the bulk of her financial resources. A transaction that impoverishes the purported donor cannot be considered fair. *Richmond v. Christian*, 555 S.W.2d 105, 107 (Tenn. 1977).

The trial court found that Brooxie Myers did not exercise undue influence over Ms. Merle, because Ms. Merle had stated that the person who cared for her would have her money. It appears

to us, however, that such a finding ignores the presumption created by a confidential relationship and benefit to the dominant party, as well as the lack of fairness in the transaction here. It also overlooks the duty of utmost good faith that an attorney-in-fact owes to her principal as a fiduciary. *See Alexander v. Inman*, 974 S.W.2d 689, 694 (Tenn. 1998); *Estate of Doyle v. Hunt*, 60 S.W.3d 838, 845 (Tenn. Ct. App. 2001); *In re Estate of Wallace*, 829 S.W.2d 696, 705 (Tenn. Ct. App. 1992). A fiduciary occupies a position of trust in regard to the affairs of her principal, and must act for the benefit of the fiduciary, rather than for her own benefit.

We do not believe that it is an act of good faith for a fiduciary to cash in a CD which is the prime financial asset of her principal without either a clear instruction from the principal to do so, or a clear need to do so for the benefit of the fiduciary. Ms. Myers's attorney implies that she was merely complying with the wishes of Ms. Merle, but the evidence for this is far from clear and convincing. While Ms. Myers testified that she needed the money from the CD to hire a sitter, the evidence indicates otherwise. It thus appears to us that Ms. Myers's action constituted a breach of her fiduciary duty, the proper remedy for which is the restoration of the money to Ms. Merle's estate.

## IV. The Dead Man's Statute

During the early part of the Brooxie Myers's testimony, her attorney asked her some questions about the circumstances surrounding the execution of the power of attorney, and the petitioner's attorney objected on the basis of the Dead Man's Statute, Tenn. Code Ann. § 24-1-203. That statute prohibits an interested party in a proceeding involving the estate of a deceased person from testifying as to transactions or statements by the deceased, unless the interested party was called to testify by the opposite party.

The trial court upheld the objection. Her attorney subsequently attempted to ask Ms. Myers if Ms. Merle was made aware that the CD had been cashed. The same objection was made and upheld. During later questioning, the petitioner's attorney asked her "[d]o you recall my taking your deposition in this matter?" The trial judge was apparently startled by this question, for he asked, "Excuse me. Did you say your took her deposition?" After closing arguments and after the trial judge announced his ruling in this case, he stated that he would have waived the Dead Man's statute if he had earlier been made aware that the petitioner's attorney had taken Brooxie Myers's discovery deposition. He went on to say "[i]t is pretty well obvious what that proof would have been, but I can't take it into account because it didn't come in."

Both parties address the question of the Dead Man's Statute in their appellate briefs. The petitioner argues that the trial court's initial ruling was correct, and the Dead Man's Statute does apply, but contends that despite his protestations to the contrary, the judge allowed himself to be influenced by his view of the testimony that Brooxie Myers would have offered if she had been permitted. The respondents argue that we should take the trial judge at his word that he did not take her presumed testimony into account.

The petitioner has drawn our attention to the case of *Ingram v. Phillips*, 684 S.W.2d 954 (Tenn. Ct. App. 1984). In that case, this court ruled that the taking of a discovery deposition by an opposing party does not take create an exception to the Dead Man's Statute, because

> Discovery is allowed in an effort to do away with trial by ambush. The purpose of discovery is to bring out the facts prior to trial so the parties will be better equipped to decide what is actually at issue. A litigant would be penalized for utilizing discovery if, by the acquisition of information under the discovery rule, it would render incompetent evidence competent.

*Id*. at 958

This is apparently still good law. Thus, the trial court's initial ruling in this case was correct, and evidence as to Ms. Merle's transactions with, and statements to, Ms. Myers were properly excluded.

### V. The Joint Checking Account

The trial court ruled that the AmSouth checking account that Ms. Merle held jointly with Douglas Myers was, like the $20,000 CD, a valid inter vivos gift. We find no evidence of delivery, and conclude that like the CD, it was not a valid inter vivos gift. However, that does not mean that it should be brought back into the estate.

The question of the proper ownership of a joint account where one of the account holders dies depends upon the exact designation of ownership found in the account documents. *See* Tenn. Code Ann. § 45-2-703; *see also*, *Carmical v. Kilpatrick*, No. M2002-00346-COA-R3-CV, 2002 WL 31863293 (Tenn. Ct. App. Dec. 23, 2002) (no Tenn. R. App. P. 11 application filed). The exhibits in the record do not include the documents that are necessary to make this determination. We therefore remand this case to the trial court so this question can be decided.

### VI. Conclusion

The trial court's finding of inter vivos gifts from Ms. Merle Halliburton Neal Myers to Brooxie Myers is reversed, and the proceeds from the Farmers and Merchants Bank Certificate of Deposit is ordered restored to the estate. This case is remanded to the trial court for further proceedings consistent with this opinion, including a determination of the proper ownership of the funds formerly held in the joint checking account at AmSouth Bank. Tax the costs on appeal to the appellees, Brooxie Myers, Douglas Myers, and James Myers.

_____
PATRICIA J. COTTRELL, JUDGE