George B. BUTLER and wife, Leah
B. Butler, Plaintiffs/Appellees,

v.

**BUICK MOTOR COMPANY, a DIVISION OF GENERAL MOTORS CORPORATION, Defendant/Appellant.**

Court of Appeals of Tennessee,
Western Section, at Nashville.

Feb. 6, 1991.

Application for Permission to Appeal
Denied by Supreme Court
June 10, 1991.

Certiorari Denied Oct. 15, 1991.

See 112 S.Ct. 307.

Albert F. Moore of Neal & Harwell, Nashville, for defendant/appellant.

Robert L. Huskey, Manchester, for plaintiffs/appellees.

TOMLIN, Presiding Judge (Western Section).

George B. Butler and wife, Leah Butler, (hereafter "Plaintiffs" or "Butler") initiated this suit in the Chancery Court of Coffee County against Buick Motor Company, a division of General Motors Corporation, ("defendant" or "Buick"). Plaintiffs sought to regain possession of a 1985 Buick Electra Park Avenue automobile they had purchased from Gaylen Fann

Auto Sales, Inc. ("Fann"), a used car and auto salvage dealer in Manchester, after the vehicle had been confiscated by a department of the state of Tennessee and possession surrendered to Buick. Following a bench trial, the chancellor held that Butler had acquired title to the automobile and was entitled to its possession.

Buick raised three issues on appeal contending that the chancellor erred in: (1) holding that plaintiffs acquired good title to the automobile on the ground that as innocent purchasers for value they bought the car from one holding a voidable title; (2) incorrectly applying an equitable maxim to the facts of this case; and (3) exercising jurisdiction and thereby hearing the case prior to plaintiffs' exhausting their administrative remedies. Our resolution of the first issue disposes of this litigation. We accordingly pretermit the second and third issues and reverse and dismiss.

Many of the material facts are undisputed. We would state parenthetically that inasmuch as we do not address the issue pertaining to the exhaustion of administrative remedies, we will touch on those facts tangentially as we relate the facts material to the primary issue.

The automobile which is the subject of this suit was what the trade would consider a "prototype test vehicle" or "pre-production" model. It was one of approximately 250 test vehicles similarly produced and tested by GM. These vehicles could not be approved for sale to the public because many of the parts on the cars had not been certified for inclusion on a production model automobile by the Department of Transportation. The automobile was built by General Motors in August, 1983 and was originally shipped that same month to its GM Buick Division in Flint, Michigan. There it was used by management-level GM employees for transportation on the public highways of Michigan. The automobile was evaluated and critiqued by the various employees who drove and used it. It was shipped with a certificate of origin from the GM factory and was appropriately titled and licensed for use on the public roads. It was a style and series that was ultimately produced and sold to the public in 1985.

After about a year and one-half of testing, Buick determined that the automobile had undergone an adequate testing process at Flint, and on February 19, 1985, the automobile in question was transported to GM's proving ground in Milford, Michigan ("Milford"). Milford consists of approximately 4,000 acres of GM-owned property, and includes a variety of test facilities such as a test track, wind tunnels, salt baths, robotics, and other testing procedures. Current and future products are regularly tested for safety and durability. The testing at Milford is done in order to obtain federal certification of certain vehicles. None of the vehicles used for testing is sold to the public.

At the time the automobile in question was delivered to Milford, Buick requested that the plate bearing the vehicle identification number ("VIN"), located on the dashboard, be removed. The VIN plate was removed from the subject automobile and returned to the appropriate office in Flint. At the same time the certificate of title that had been issued in the name of Buick engineering in Flint was surrendered to the Secretary of State. The surrender of the title certificate to the Michigan Secretary of State and the removal of the publicly-displayed VIN plate prevented and inhibited the possibility of unlawful transfer of title to this vehicle.

Jack L. Clingingsmith ("Clingingsmith") was employed by GM as a supervisor in charge of driver training and durability testing at Milford. In that capacity he was permitted to use vehicles such as the subject automobile as "yard cars" for transportation on and about the proving ground itself but not on the public roads of Michigan. When the cost of maintaining a "yard car" exceeded its usefulness, it was destroyed in accordance with standing orders. Standard scrapping orders accompanied the subject car when it arrived in Milford. It was not part of Clingingsmith's duties to scrap the car, but it was his responsibility to witness the scrapping and to document its destruction. From the

time the subject vehicle was produced and delivered to the Buick Division in Flint, it was GM's intention that it would end up as scrap.

Without GM's knowledge and authority, Clingingsmith disposed of the subject automobile, along with others, by selling it as an operating vehicle to Mr. Ingo Nicolay, an employee of a used-car lot in Michigan. Clingingsmith covered the transfer of the subject automobile and others to Nicolay by a false paper trail. He supplied false documents to Buick at Flint indicating that this automobile had been reduced to scrap. Nicolay transferred the vehicle to Donald Holloway, who operated an automobile salvage yard in Michigan. Neither Nicolay nor Holloway was employed by GM. Both of them were aware that Clingingsmith did not have the authority to sell the subject auto or the other vehicles, but they went ahead and accepted the automobiles without properly endorsed certificates of title or the required VIN plates in violation of state and federal law.

Gene Taylor was a buyer and salesman for Fann. Taylor and Fann formed a joint venture in connection with the buying and selling of these untitled and non-VIN-plated test vehicles. Taylor acquired the subject automobile and others from Holloway, with only a bill of sale to document the transfer. Holloway did not furnish Taylor with a certificate of title or other documents verifying his ownership, but neither did he conceal the fact that the VIN plate had been removed. Taylor testified that he never dealt with Clingingsmith or anyone else at GM in connection with purchasing these automobiles. He dealt only with Holloway. Taylor further testified he understood that the cars were to be used for parts and that he sold them for parts only. He stated that he never made any investigation about the title to the vehicle.

When this and other automobiles arrived in Tennessee, Fann applied to the state of Tennessee for a "permit to dismantle" each vehicle. The permit issued by the Department of Revenue was required in order to disassemble a vehicle so that the component parts could be sold separately.

Taylor testified he had purchased "test cars" from other manufacturers, but he had never before purchased test cars manufactured by GM. Taylor further testified he "could have" told GM investigators that he did not "intend to sell the cars to anyone to be driven around in Tennessee."

At the time Fann sold the subject automobile to the plaintiffs, he endorsed over to them the certificate to dismantle. Plaintiffs, however, did not intend to disassemble the vehicle and sell its parts. To the contrary, on the day of purchase in August, 1985, they applied to the Tennessee Department of Revenue for a "reconstructed title," submitting the "permit to dismantle" as proof of ownership. In October, following plaintiffs' application for a certificate of title, the state of Tennessee requested that plaintiffs take the automobile to the Tennessee Highway Garage in Tullahoma for inspection. In February of the following year a certificate of title was issued to plaintiffs by the Department of Revenue.

The inspection of the subject auto resulted from an ongoing investigation that began in the fall of 1985. The investigation involved automobiles Fann sought to have titled that were not accompanied by necessary supporting documents. The issuance of the title to Butler was delayed somewhat during the investigation. The title was issued, however, before the Tennessee Department of Revenue ascertained with certainty that the automobile had been stolen from GM.

Once the result of the investigation into the status of this and similar automobiles became known to Taylor, Fann, and the state of Tennessee, Taylor supplied information to GM security officers that led to Clingingsmith. Upon learning that he had stolen the test vehicles and disposed of them, GM discharged Clingingsmith. Ultimately, Clingingsmith, Nicolay, and Holloway were summoned to appear in the United States District Court for the Eastern District of Michigan. There they pled guilty to and were convicted of conspiracy to traffic in motor vehicles without identification numbers.

As a result of this investigation, the Tennessee Department of Safety impounded the subject automobile and delivered it to a member of the Security Department of GM, who returned it to Michigan. The Tennessee Department of Revenue later revoked the plaintiffs' "reconstructed title." Following the impoundment, plaintiffs filed suit against the state of Tennessee. They alleged that they had proper title and were entitled to possession of the vehicle. Shortly thereafter, plaintiffs amended their complaint to include as defendant Buick Motor Company, a division of GM, and asked the trial court to determine who was the proper party entitled to the automobile. The state was later dismissed from the lawsuit by an order agreed to and entered by plaintiffs.

## I. PLAINTIFFS' TITLE—VOID OR VOIDABLE?

The trial court rejected the case of *Jernigan v. Ham*, 691 S.W.2d 553 (Tenn.App. 1984), as authority for ruling in favor of plaintiffs. The chancellor ruled that plaintiffs were good-faith purchasers from a seller who had a voidable title, and they were entitled to claim title as well as possession.

Whether the title was void or voidable, however, depends upon whether Clingingsmith had the authority to dispose of the vehicles in the way he did. Necessarily, we look to the actions of both GM and Clingingsmith to see if such authority existed. First, the proof shows that GM caused the VIN plate to be removed from the vehicle. GM also delivered the vehicle's title certificate to the Michigan Secretary of State, which prevented the lawful transfer of the vehicle under the laws of Michigan. It is undisputed that GM contemplated the destruction of this automobile at the end of its useful life and had taken appropriate steps to have it destroyed. However, Clingingsmith's sale of the vehicle thwarted its destruction.

Furthermore, plaintiffs failed to show that Clingingsmith had the actual or ostensible agency authority to do what he did—sell and dispose of GM property. Both Butler and Taylor admitted they never dealt with Clingingsmith or any other GM employee in connection with the purchase of this automobile. To the contrary, Butler dealt exclusively with Gaylen Fann.

To establish their claim of good title as good faith purchasers for value, plaintiffs rely upon a section of the U.C.C., codified as T.C.A. § 47–2–403, which reads in pertinent part as follows:

> **47–2–403. Power to transfer—Good faith purchase of goods—"Entrusting."**—(1) A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though:
>
> . . . .
>
> (d) the delivery was procured through fraud punishable as larcenous under the criminal law.

Although it is not clear from the chancellor's opinion, he may have had the above Code section in mind when he made the following observation in his memorandum opinion:

> Now, if it were a situation where Mr. Nicholay [sic (Nicolay)] had gone over the fence at the Milford Proving Grounds and cut a hole in it and driven this vehicle off, we wouldn't be here right now because that would be clearly a stolen vehicle that passes no title whatsoever. If Mr. Nicolay had been in league with a night watchman or a mechanic and gotten possession of it in that fashion, there wouldn't be any question about it because no title could pass. . . . Mr. Clingingsmith, on the other hand, has repetitiously and fraudulently delivered the vehicle to Mr. Nicolay covering his trail by turning in the VIN number and doing the necessary paperwork that appeared that that vehicle had been crushed.
>
> In this situation we have a General Motors agent disposing of the property

illegally, fraudulently—there's no question about that—embezzling.

The principle of law that we find to be applicable is well stated in 63 Am.Jur.2d *Property* § 44, which reads in part as follows:

§ **44. Theft of personal property as affecting owner's title and rights.**

The theft of goods or chattels does not divest one who owns, or has title to, such property from his ownership of the property; the owner may follow and reclaim the stolen goods wherever he may find them, even if such goods have been changed or improved.

 This rule has long been applied by the courts of this state. In *Insurance Co. of North America v. Cliff Petit Motors, Inc.,* 513 S.W.2d 785 (Tenn.1974), it was declared that the subsequent purchaser of stolen property, however innocent he may be, does not acquire title to the property (citing cases). In so holding the court stated:

The aforementioned rules remain the law in Tennessee, therefore, it necessarily follows that Judy Faye Woods [the ultimate purchaser] had neither a legal or equitable interest in the stolen vehicle; but rather, she had only a bare possessory interest therein.

*Id.* at 787.

The proof is uncontradicted that Clingingsmith, without GM's consent or authority, unlawfully and feloniously misappropriated several GM automobiles, including the one involved in this litigation. He unlawfully sold the subject automobile, without a certificate of title or VIN plate, to Nicolay, who in turn sold it to Holloway, who acted as a distributor of this and other stolen automobiles. Without knowledge of these larcenous acts, Taylor purchased the automobile, accompanied by a bill of sale, from Holloway. Ultimately, the automobile appeared on the lots of Gaylen Fann's Auto Sales and was sold to the plaintiffs under an endorsed title to dismantle.

We find that Clingingsmith had no authority to dispose of the automobile at all. Inasmuch as he was without such authority, his actions constituted theft. All purchasers of the subject automobile thus took possession with void title. At all times GM remained the true owner. Under these circumstances, we hold that plaintiffs acquired neither a legal nor an equitable interest in the vehicle that could prevail over the rights of GM. Plaintiffs acquired nothing more than a possessory interest.

GM, being the true owner of the automobile, is entitled to its possession. Accordingly, the decree of the chancellor is reversed. Costs in this cause on appeal are taxed to plaintiffs, for which execution may issue if necessary.

HIGHERS and FARMER, JJ., concur.