IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
March 10, 2010 Session

**BLUFF SPRINGS APARTMENTS, LTD. ET AL. v. PEOPLES BANK OF
THE SOUTH ET AL.**

**Appeal from the Circuit Court for Campbell County**
**No. 14141     John D. McAfee, Judge**

**No. E2009-01435-COA-R3-CV - FILED MAY 26, 2010**

R. L. Ayers operates several apartment complexes, some individually and some in his capacity as the general partner of the limited partnerships, Bluff Springs Apartments, Ltd., and Village Apartment, Ltd. As a consequence of these interests, he maintained several bank accounts with Peoples Bank of the South. This litigation focuses on seven of those accounts. Ayers has admitted – and in fact has pleaded guilty – to defrauding Peoples and two other local banks by "kiting" checks.[1] It is undisputed that Peoples sustained substantial losses when the other banks discovered the scheme and dishonored checks, leaving Peoples holding several hundred thousand dollars worth of bad checks; however, the precise amount of the loss is in dispute. In August 2003, Peoples froze the accounts that had been opened by Ayers, but, with one exception, waited until September 29, 2006, to offset the monies in those accounts against its losses. Ayers, Bluff Springs and Village (collectively "the Plaintiffs") filed this action asking for a declaration that Peoples wrongfully converted the funds in the seven accounts and violated the contracts under which the funds were deposited. The Plaintiffs also sought punitive damages. Peoples coupled its answer with a counterclaim. In its counterclaim, Peoples alleged that, after giving the Plaintiffs all credits to which they were due, it was left holding $429,300 in bad checks; it demanded a judgment for that sum. After a bench trial, the court held that Peoples only had a right of setoff against two accounts owned by Ayers individually. The court held that Peoples did not have a right of setoff against the accounts owned by the entities or the one opened in Ayers' name for tenant deposits. However, the trial court found in favor of Peoples on its counterclaim and awarded it a judgment against Ayers in the amount of $429,221.65, subject to certain credits to be given. Initially, the trial court awarded both Peoples and the Plaintiffs prejudgment interest at the rate of 10%. On Peoples' post-trial motion, the court cut the interest rate to 1%. Peoples appeals, arguing, primarily, that the three-year statute of limitations applicable to conversion claims bars all of the Plaintiffs' claims. The Plaintiffs raise their own issues

---

[1]The actual charge to which Ayers pleaded guilty was aiding and abetting bank fraud.

including a challenge to (1) the trial court's refusal to order the return of funds held in accounts designated for a special purpose, (2) the trial court's reduction of pre-judgment interest on a post-trial motion, and (3) the amount of damages awarded on the counterclaim. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and JOHN W. MCCLARTY, J., joined.

P. Edward Pratt and Melissa Loney Stevens, Knoxville, Tennessee, and C. Mark Troutman, LaFollette, Tennessee, for the appellant, Peoples Bank of the South.

Dudley W. Taylor and Jonathan S. Taylor, Knoxville, Tennessee, for the appellees, Bluff Springs Apartments, Ltd., Village Apartment, Ltd., and R.L.Ayers.

**OPINION**

**I.**

**A.**

Some background information will help the reader understand the particulars of the seven accounts in this case. The United States Government, through the Rural Development Agency (" the RDA")[2], provides incentives, including mortgage financing, to apartment owners who rent to low and moderate income tenants. The RDA exercises some oversight with respect to the properties to which it extends incentives. As pertinent to the present case, the RDA requires that apartment owners, who are subject to RDA oversight, maintain separate accounts for each of the following: general operating funds, "replacement reserve" funds, tenant security deposits, and, finally, taxes and insurance. The purpose of the replacement reserve account is to ensure that monies will be available to maintain the units in good repair and to make necessary upgrades and replacements. The owner must make the RDA a joint signatory on replacement reserve accounts. The purpose of the tenant security deposit account is to ensure that the owner has the funds to pay any unused deposits to departing tenants. The purpose of the taxes and insurance account is to provide the funds for

---

[2]The RDA was named as a defendant by the Plaintiffs in an amended complaint. The RDA appeared at trial, but called no witnesses and asserted no claims. The RDA's position at trial was that it would wait until later to determine its course of action.

the owner to pay property taxes and insurance premiums as they accrue. Periodically, the RDA reviews the accounts for compliance.

Bluff Springs, a limited partnership, was formed in 1982 for the purpose of owning low-income housing. Three limited partners own 97.5% of the interest. Ayers owns 2.5% interest in Bluff Springs as its sole general partner. Village, also a limited partnership, was likewise created to own low-income housing. It was formed in 1981. One limited partner owns 95% of the entity and Ayers owns 5% as the general partner.

In addition to the apartments owned by Bluff Springs and Village, Ayers owns some apartments in his own name. Of the seven accounts at issue in this litigation, all were subject to RDA oversight. They were all opened by Ayers, but only three – the ones pertaining to the apartments Ayers owned individually – were owned outright by Ayers. One belonged to Bluff Springs and three belonged to Village. Each account was opened by way of the same form document supplied by Peoples styled "Business Account Agreement" ("the Agreement"). Each of the Agreements contains the account number, the name of the owner, the name assigned to the account, and the specimen signature of all persons authorized to draw against the account. Each of the Agreements states that its "terms govern the operation of this account unless varied or supplemented in writing." Each of the Agreements contains a paragraph bearing the heading "SET-OFF" followed by this language:

> You agree that we may (without prior notice and when permitted by law) set off the funds in this account against any due and payable debt owed to us, now or in the future, by the account holder. . . . This right of set-off does not apply to this account if . . . the debtor's right of withdrawal arises only in a representative capacity.

The particulars of each of the seven accounts, as reflected in the relevant exhibit, are as follows.

EXHIBIT 1

Account number: 1-xxxx-72

Account owner: Bluff Springs Apts., LTD Reserve for Replacement Acct. % R.L. Ayers

Account name: Bluff Springs Apts., LTD

Signatures: (one of these) R.L. Ayers [and] Helen Ayers (*and* one of these) Jerry Amonette

Funds in account when frozen: $30,316.02

Funds in account when setoff: $31,143.95

## EXHIBIT 2

Account number: 1-xxxx-10

Account owner: Village Apt. Ltd Reserve for replacement

Account name: Village Apt LTD Reserve for Replacement

Signatures: Shirley L. Bailey, Bobby K . Winter, R. L. Ayers and Helen Ayers

Additional information: Letter on file concerning Guidance on implementing regulations governing FmHA counter signature on Multi-Family Reserve Accounts. 2 signature[s] required/One a representative from FmHA and one from either R L Ayers, Helen Ayers

Funds in account when frozen: $58,997.29

Funds in account when setoff: $60,608.50

## EXHIBIT 3

Account number: 1-xxxx-05

Account owner: Village Apts LTD Taxes/Ins. R. L. Ayers or Helen Ayers or Joye Ayers Smith

Account name: Village Apts LTD Taxes/Ins.

Signatures: R. L. Ayers, Helen Ayers, Joye Ayers Smith

Funds in account when frozen: $9,017.14

Funds in account when setoff: not proven

EXHIBIT 4

Account number: 0xx-xxx-8

Account owner: Village Apartment LTD

Account name: Village Apartment Ltd

Signatures: R. L. Ayers, Helen Ayers, Joye Ayers Smith

Funds in account when frozen: $9871.05

Funds in account when setoff:  $9871.05

EXHIBIT 5

Account number: 9xx-xxx-1

Account owner: R. L. Ayers F.H.A. Aprs Reserve for Replacement

Account name: R. L. Ayers F.H.A. Apts.

Signatures:  R. L. Ayers, Helen Ayers, Jerry Amonette

Funds in account when frozen: $16,763.46

Funds in account when setoff: $17225.69

EXHIBIT 6

Account number: 1-xxxx-13

Account owner:  FmHA Apts Taxes/Ins. Account

Account name:  FmHA Apts Taxes/Ins. account

Signatures:  R. L. Ayers, Helen Ayers, Joye Ayers Smith

Funds in account when frozen: $4,053.33

Funds in account when setoff: $4,179.41

EXHIBIT 7

Account number: xxxx0

Account owner: [missing]

Account name: F.H.A. Security Deposit for R. L. Ayers Apts.

Signatures:  R. L. Ayers, Helen Ayers, Ann Orick

Funds in account when frozen: $7,433.08

Funds in account when setoff: $7,503.12

Ayers testified at trial that he kited checks to try to cover a shortfall created when his son stole approximately $500,000 from a family used car business.  The kiting occurred in 2002 and part of 2003.  Ayers testified that once Peoples discovered the fraud, he tried immediately to cover the bank's losses.  He "rounded up every dollar [he] could get hold of" and paid $337,578.35 to Peoples to apply against its losses.  According to Ayers, his accountant determined that the remaining loss to Peoples, after payment of the $337,578.35, was $117,050.  It was this amount that he was ordered by the federal court to pay to Peoples in restitution under his plea agreement[3]; however, the court allowed him to make the restitution in monthly payments of $200.  Ayers testified that he tried to obtain a loan from Peoples in the amount of $117,050 to cover the remaining losses but Peoples refused to make the loan.

On cross-examination, Ayers admitted that there were checks going into the Village general operating account from other entities owned or controlled by Ayers that did not owe Village money.  In other words, the Village general operating account was used as a vehicle in his check-kiting scheme.  Also during his cross-examination, Ayers was confronted with two groups of checks that were deposited at Peoples after being written on accounts at another local bank on other businesses that Ayers owned.  The checks were dishonored by the other bank resulting in a loss to Peoples.  They were admitted as trial exhibits 24 and 25.

_____

[3]It is undisputed that Peoples had no role in the prosecution and did not present proof therein as to the amount of its loss.

Exhibit 24 consisted of 40 dishonored checks totaling $337,500 written from August 1, 2003, to August 7, 2003. The checks making up Exhibit 24 were covered by the $337,578.35 payment by Ayers after his kiting activity was discovered. Exhibit 25 consists of 49 dishonored checks written August 5, 6, and 7, 2003, totaling $429,300. Ayers admitted that the number, amount and origin of the checks in exhibits 24 and 25 were representative of the checks he was writing on a daily basis in his check-kiting scheme. When asked by opposing counsel and the court what happened to all the money, Ayers responded that he did not put any money in his pocket; he had "lost over half a million dollars . . . and I had to cover the checks that went out." Ayers also admitted that he did not examine the dishonored checks being held by Peoples when, along with his accountant, he attempted to determine Peoples' loss.

David Reynolds, the president of Peoples, testified concerning how check kiting works and how the bank sustained its losses. According to Reynolds, small banks, such as Peoples, are more prone to sustain losses from check kiting than larger banks. Eager to generate deposits and goodwill, small banks often extend "immediate credit" on deposits when made. When immediate credit is given, the customer can deposit a check and immediately write another check against the funds deposited. If the first check does not clear, the bank sustains a loss in the amount of the credit given unless there are other funds to cover the bad deposit. A customer who finds himself without funds on deposit to cover the customer's outstanding checks can generate a false appearance of funds by utilizing, usually, three or more small banks. The customer writes a check on an account at bank one and deposits it in bank two; the customer then writes a check from bank two and deposits it in bank three; then he deposits a check from bank three to bank one. The pattern continues until the false bottom is discovered. Once the circular pattern is discovered, and any given bank refuses to honor a check, the last bank to act is left holding the bag, *i.e.*, the bad checks. According to Reynolds, Peoples waited one day too long to act and ended up with the lion's share of the bad checks from Ayers' activity. Reynolds testified that the checks represented by exhibits 24 and 25 reflect the total loss to the bank when they discovered the check kiting. Ayers then paid $337,578.35 against the losses, reducing the loss, according to the bank, to $429,300.[4] The court expressed concern that the checks did not necessarily represent the loss unless the bank could substantiate through debits and credits that it lost the money. Counsel for Peoples addressed the issue by putting on proof that at the end of each month the money was gone. In the end, other than the accounts against which the bank sought to exercise setoff, there were no funds on deposit to cover the credit previously given. As Reynolds explained to the court, "There wasn't money. There was no money. The money was gone."

_____

[4]The loss of $429,300 was reduced to $428,721.65, the amount reflected in the judgment, because Ayers' payment of $337,578.35 was slightly more than the amount of the bad checks to which it applied.

Reynolds was asked by Peoples' counsel to explain why it set off accounts owned by Village and Bluff Springs against monies owed by Ayers. Reynolds' response was that checks used in the kiting went through those accounts. Also, Reynolds testified that Ayers used the general operating account for Village as collateral on a loan as if he were the true owner of the account. On cross-examination, Reynolds made some telling concessions. He admitted that Peoples sustained no losses pertaining to the Village or Bluff Springs accounts. Reynolds also admitted that, without being shown the paperwork on the loan, he could not say for sure which account was posted as collateral. To an extent, Reynolds' recollection was refreshed on redirect that the account used as collateral was account number 2 (exhibit 2); however, on re-cross he admitted that the loan was to Village and not Ayers and Ayers signed "for" Village. Also, Reynolds admitted that the loan was repaid.

On cross-examination, Reynolds was asked whether Peoples had "an accounting . . . where you've analyzed in/outs and all of that to come up with a bottom line?" Reynolds responded, "That's in your statement," and "Our records will back up our numbers." Reynolds was cross-examined about the timing of the bank's freezing of the accounts versus actually applying the balance in the accounts against its losses. Reynolds testified that as to one account, the general operating account for Village, the bank put the balance of approximately $9,000 "into a pending settlement type account . . . until we determined whether or not we should take it . . . whether or not we should give him credit against his deficit." This happened in August 2003. As to all the other accounts, the bank denied Ayers access effective August 2003. Then, in a debit memo dated September 27, 2006, the bank actually took the money out of the accounts and transferred the funds as a credit against its loss.

The first witness called at trial by the Plaintiffs was a representative of the RDA, Anita Brooks, who had dealings with Reynolds in the August 2003 to September 2006 time frame. According to Ms. Brooks, Ayers self-reported the problem with the bank accounts. She then spoke to Reynolds. Reynolds reportedly told Ms. Brooks in September 2003 "that the money was there, there may not be a problem, but he wanted somebody to tell him that it wasn't a problem." According to Brooks, she was concerned for two reasons. It is the agency's role to monitor compliance by the apartment owner. Also, as part of the financing arrangement, the government retains a security interest in rents, revenues and all proceeds; "everything out there." There were later conversations with Reynolds to "ask the status." Reynolds, according to Brooks, "said nothing has changed." Brooks was never notified by the bank that it had in fact applied the funds in the accounts by way of a setoff. Brooks testified, consistent with the bank statements on the subject accounts, that the bank continued to accrue and reflect interest on the accounts. She testified that, although the seizure of the accounts constituted an event of default, the agency allowed Ayers, Village and Bluff Springs to establish replacement accounts and continue to operate to the date of trial. Brooks'

testimony prompted an exchange between the court and counsel wherein counsel for the Plaintiffs stated that, as of August 2003, his clients "were denied access to those funds from that date forward." Brooks testified that there would be no legitimate reason for large checks from the unrelated accounts to be routed through the Village and Bluff Springs accounts and that such activity would be in violation of Plaintiffs' arrangements with the RDA

B.
.

The court's opinion is transcribed, but not in typical dictated format. Rather, it takes the form of a lengthy give-and-take between court and counsel; the court's reasoning must be gleaned from that discussion. As to the accounts owned by Bluff Springs and Village, (exhibits 1, 2, 3 and 4), there was no right of setoff because they were not the debtor to the bank. Ayers was the debtor and not the owner of the accounts. Absent proof that allowed piercing of the entity, and there was no such proof in the court's opinion, those accounts were not subject to setoff. As to exhibit number 7, the account opened with Ayers as the owner for tenant security deposits, counsel for Peoples conceded that the bank had no proof that Ayers had any personal interest in those funds. Accordingly, the court resolved that issue in favor of the plaintiffs. As to the other two accounts, exhibits 5 and 6, counsel for the Plaintiffs conceded that the accounts belonged to Ayers and that, but for his argument that they were special purpose accounts, the bank would have the right to setoff those accounts against its losses. Also, counsel for the Plaintiffs contended that it was not the right of the U. S. Government to the monies that was important, but rather the fact that they were identified in the Agreement as special use accounts. In fact, counsel for the Plaintiffs agreed that, as to exhibit 6, the taxes and insurance account, Ayers could pull the money out at will. The court found that exhibits 5 and 6 were owned by Ayers and that by simply naming the accounts as "reserve replacement" account and "taxes and insurance" account, Ayers did not in any way restrict his ability vis-a-vis the bank, to spend the funds in any way he saw fit. Accordingly, the court resolved exhibits 5 and 6 in favor of Peoples and its claimed right of setoff.

The bank argued that the three-year statute of limitations applicable to actions for detention or conversion of personal property, Tenn. Code Ann. § 28-3-105 (2000), barred the Plaintiffs' claims. The court made a specific finding of fact "that as of August 2003 when these accounts were froze[n], that was the effective date when Mr. Ayers was denied access to these moneys and these moneys were effectively taken on that date." Accordingly, the court held that all tort claims for conversion were barred, but still allowed the Plaintiffs to recover on the accounts that the court had resolved in their favor under the Plaintiffs' breach of contract claims. As to Peoples' claim for damages, despite the Plaintiffs' argument that the checks proved nothing without an "accounting," the court stated that

I think I finally . . . understood the accounting . . . when we got Exhibits 26, 27 and 28 admitted . . . . And once you do the adding of those figures, it's sort of about even. . . . [A]nd then all of a sudden we started getting these returned checks which we had given credit for. And those returned checks for that period of time . . . total $766,800.

So the court believes that the bank . . . has carried its burden of proof with reference to that.

## C.

The court entered a final judgment on February 9, 2009, which incorporated its memorandum opinion and awarded the Plaintiffs recovery of accounts 1, 2, 3, 4 and 7, with interest to run from August 25, 2003 "at the statutory rate of 10% per annum." The judgment stated that the Plaintiffs were not entitled to recover accounts 5 and 6 and that the "Bank properly setoff such funds against a debt owing to the Bank by Ayers." The judgment treated the conversion claim as barred by the statute of limitations, and denied the claim for punitive damages for lack of a viable tort claim. Finally, the judgment awarded Peoples damages against Ayers in the amount of $429,221.65 with interest at the statutory rate of 10% per annum from September 1, 2003, a date stipulated by counsel for Peoples, with credit to be given for the setoff of accounts 5 and 6 and restitution paid through the date of trial of $6,600.

## D.

On March 11, 2009, Peoples filed a motion to alter or amend the judgment "relative to both the prejudgment interest and post judgment interest" by reducing both to the contract rate being paid on the accounts of approximately 1%. On May 4, 2009, Peoples filed a amended motion to alter or amend adding the argument that the court misapplied the statute of limitations. Peoples argued as follows:

Under Tennessee law, the applicable statute of limitations will be determined by the gravamen of the complaint, and only one statute of limitations will be applied to any one action. *Whaley v. Perkins*, 197 S.W.3d 665 (Tenn. 2007); *Pera v. Kroger*, 674 S.W.2d 715 (Tenn. 1984); *Vance v. Shulder*, 547 S.W.2d 927 (Tenn. 1977)[;] . . . *Gunter v. Laboratory Group of America*, 121 S.W.3d 636 (Tenn. 2003). Here, the gravamen of the Plaintiffs' complaint is clearly for conversion of deposited funds

-10-

by wrongful set off which is governed by the three year statute of limitations.

(Parentheticals omitted.) The court rejected Peoples' argument that only one statute of limitations could apply to any given complaint, and it also rejected the Plaintiffs' argument that the court could not exercise its discretion to reduce interest to a rate that it deemed reasonable under the circumstances. Accordingly, the trial court denied the motion "to the extent that it seeks dismissal of the entire claim . . . based on the statute of limitations," but granted the "request to change the rate of interest, with the Court reducing the interest rate from 10% to 1%."

II.

In this appeal, Peoples raises the following issues:

Whether the trial court erred in failing to recognize the gravamen of Plaintiffs' Complaint to be in tort, requiring the entirety of the action to be dismissed as barred by the three (3) year statute of limitations set forth in Tenn. Code Ann. § 28-3-105.

Whether the trial court erred in ordering the return of funds frozen in certain bank accounts after the Defendant Bank sustained losses upon discovery of Plaintiff R. L. Ayers' check kiting activities.

The Plaintiffs set forth the following issues in addition to those raised by Peoples:

Whether the trial court erred in failing to order the Bank to restore the funds in the fifth account and sixth account.

Whether the trial court erred in granting the Bank's Motion to Alter or Amend to the extent of reducing the prejudgment interest.

Whether the trial court erred in awarding the Bank judgment in the amount of $429, 221.65 on its [counterclaim] against Ayers.

III.

Most of the issues in this case fall within the well-settled standard for reviewing a trial court's judgment entered following a bench trial. That standard was stated in *In re Angela E.*, 303 S.W.3d 240 (Tenn. 2010) as follows:

> Where, as here, the trial court sits without a jury, we review findings of facts de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is otherwise. Questions of law. . . are reviewed de novo with no presumption of correctness.

*Id.* at 246 (citations omitted).

IV.

A.

We begin with the statute of limitations issue. Peoples argues that – based on the language in multiple cases stating that the statute of limitations is determined by the gravamen of the complaint – one and only one statute of limitations must be applied to every claim in a given complaint. We disagree.

We readily acknowledge that there is language in the cases Peoples cites that, when lifted out of the context of the key facts and ultimate holdings, purports to state a rule broad enough to support Peoples' argument. *See Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006)( "The 'applicable statute of limitations . . . will be determined according to the gravamen of the complaint.' ")(*quoting Gunter v. Lab. Corp. Of America*, 121 S.W.3d 636, 638 (Tenn. 2003)(*quoting Vance v. Schulder*, 547 S.W.2d 927, 931 (Tenn. 1977)); *Pera v. Kroger*, 674 S.W.2d 715, 719 (Tenn. 1984)("It is well settled in this state that the gravamen of an action, rather than its designation as an action for tort or contract, determines the applicable statute of limitations." ). It is our duty in reading general language used in an opinion to determine whether it goes beyond the point necessary to the facts and holding of the case; if so, we are bound by the holding but not by the general language used to lay a foundation for the holding. *Gunter*, 121 S.W.3d at 641. In looking beyond the language to the specifics of the above cases, we are convinced that the subject rule is not as broad as to preclude the application of different statutes of limitations to different claims made in the same complaint.

In ***Whaley***, the primary issue before the Supreme Court was whether the one-year statute of limitations for personal injury or the longer three-year statute applicable to property damage claims applied. The defendant contended that allegations of mental distress brought the claims within the ambit of personal injury, whereas the plaintiff argued that "emotional distress is not a separate cause of action but is instead only an element of damages arising from their property damage claim." ***Id.*** at 670. The High Court held in favor of the plaintiffs because the "claim for damages for emotional distress was merely an element of their overall claim for damages for the injury to their property and not a stand-alone cause of action." ***Id.*** at 671 (internal quotation marks omitted). The High Court did *not* hold that any one complaint can only be read to contain only one claim or that all such claims must be evaluated based on one statute of limitations. The only issue the Court decided relative to the statute of limitations was whether the "claim for [emotional distress] damages was barred by the one-year statute of limitations applicable to personal injury actions."

***Gunter*** is another case that quotes the same broad rule without holding that a given complaint cannot have multiple claims with different gravamen. ***Gunter*** involved a putative father's complaint against the laboratory that did his paternity test. Mr. Gunter alleged that the lab negligently performed its work because it found him to be the father of a child even though he had never had sex with the child's mother. 121 S.W.3d at 638. The dispositive issues in the case were (1) whether the claim was for medical negligence or common negligence and (2) whether the claim was for injury to the person or injury to property. For the answers to these questions the High Court looked not only to the case law, but also the gravamen of the complaint. We find it significant that in ***Gunter*** the Court specifically noted it was not deciding whether the statute of limitations applicable to contract claims might also apply. ***Id.*** at 638 n.3 ("The Court of Appeals held that the six-year statute of limitations for contract actions did not apply in this case. Neither party raised this issue on appeal to our Court."). If the rule Peoples advocates were as encompassing as it argues, then the ***Gunter*** Court would not have needed to even mention the contract claim; the determination that the gravamen of the "complaint" was negligent injury to property would have necessarily determined that it could not also be breach of contract.

***Pera*** is, in a way, the flip side of ***Whaley***. Ms. Pera sued her bank for dishonoring her check and the grocery store, Kroger, for prosecuting her for a bad check. 674 S.W.2d at 717. The bank raised the one-year personal injury statute of limitations as a defense. Both the trial court and this Court held that the general six-year statute for contracts applied. ***Id.*** at 719. The bank argued that the shorter statute should apply because Ms. Pera was really seeking to recover for injury to her person. The High Court agreed, stating as follows:

> There is no question from the complaint and from the record that
> the gravamen of the action in the present case was mental

anguish, humiliation, embarassment, and damage to reputation.
Plaintiff established no special or monetary damages whatever.

*Id.* at 719. Thus, while ***Whaley*** was controlled by the three-year statute because the injury flowed from damage to property, ***Pera*** was controlled by the shorter statute because there was only injury to the person.

In ***Vance***, even though there was strenuous argument concerning which of five possible statutes of limitations applied, the Court saw the case as a simple, straightforward damage to property interests from misrepresentation. 547 S.W.2d at 931. The Court summed the whole case up as follows: "Plaintiff alleges damages resulting from face to face misrepresentations of material facts which induced him to sell his stock at a much lower figure than reasonable." ***Id***. Ultimately, the Court held that the action filed four years after the misrepresentation was untimely. ***Id***. at 927, 933.

We read the above cases as being before the High Court based on complaints which present only one viable claim. In ***Gunter***, for example, even if the complaint stated a viable claim based on breach of contract, that issue had dropped out of the case before it reached the Supreme Court. Thus, none of those cases addressed the issue before us, *i.e.*, whether, in a complaint that makes more than one viable claim, one claim can survive despite another in the same complaint being barred by a statute of limitations. Opinions of this Court have addressed that very issue, and answered in the affirmative.

One example is ***Taylor v. Trans Aero Corp.***, 924 S.W.2d 109 (Tenn. Ct. App. 1995). Mr. Taylor leased an airplane to Trans Aero. The lease required Trans Aero to return the plane to Taylor at the end of the lease in its original condition. Also, allegedly, Trans Aero verbally committed to insure the plane for Taylor's benefit. When Trans Aero crashed the plane, Taylor filed a complaint alleging that the defendants breached the lease and the oral contract to insure the airplane. On appeal, one issue was the timeliness of the complaint. This Court observed the rule articulated in ***Pera***, but held that one claim was timely and one claim was not. ***Id***. at 113. The complete analysis is as follows:

> TAC and FMI also assert that Taylor's suit is barred by the three-year statute of limitations for property damages, T.C.A. § 28-3-105 (Supp.1995). Defendants assert that the gravamen of the complaint is to recover property damage to the aircraft and that the three-year statute of limitations for property damage should apply rather than the six-year statute of limitations for breach of contract provided in T.C.A. § 28-3-109 (Supp.1995).

-14-

> We agree with the defendants that the gravamen of the action
> rather than its designation as an action in tort or contract
> determines the applicable statute of limitations. The applicable
> statute of limitations is determined by the subject matter of the
> controversy rather than the remedial procedure employed. In
> the instant case, Taylor seeks recovery for property damage to
> the aircraft. The gravamen of this claim is obviously property
> damage and thus, this claim is barred by T.C.A. § 28-3-105. *In
> addition*, Taylor is seeking a recovery of damages based on the
> defendants' breach of the contractual promise to insure the
> aircraft for $150,000.00. The gravamen of this claim is breach
> of contract, and thus, the claim was timely filed under T.C.A. §
> 28-3-109.

*Id.* at 112-13. (emphasis added; case citations omitted).

Another example of two statutes of limitations being applied to one complaint is our opinion in ***Lewis v. Caputo***, No. E1999-01182-COA-R3-CV, 2000 WL 502833 (Tenn. Ct. App. E.S., filed April 28, 2000). In ***Lewis***, a client sued his former criminal defense attorney. In our analysis, the complaint alleged two separate causes of action. *Id*. at *4. One involved the attorney's alleged negligence in allowing the client to plead guilty based on "faulty" advice. *Id.* The second involved the attorney's alleged breach of his contract to represent the client "in all matters, including appeals" by the attorney's refusal on ethical grounds to represent the client in a post-conviction proceeding. *Id*. at *1. The conclusion we reached was that "the plaintiff's malpractice claim is subject to a one-year statute of limitations and his breach of contract claim is subject to a six-year statute of limitations." *Id.* at *4.

There is little question that the Plaintiffs in the present case present both a breach of contract claim and a conversion claim. The complaint, of course, is based on the accounts the Plaintiffs established with Peoples with an express understanding between the parties concerning those accounts. Paragraph 25 of the complaint asks for a declaration of "the rights and liabilities of the parties with respect to [those a]ccounts." Paragraph 26 alleges, among other things, that "[t]he Defendant Bank breached its contractual obligations to Plaintiffs as depositors." In fact, post-trial counsel for Peoples conceded at the hearing on the motion to alter or amend that the complaint was sufficient under notice pleading to put the bank on notice of a breach of contract claim. He stated: "I believe there is notice of the claim. I just don't think it survives the statute of limitations."

It follows from the above discussion that the Plaintiffs filed a complaint with two potentially viable claims, one sounding in conversion of property and one sounding in breach of contract. The conversion claim is subject to a three-year statute of limitations for damage to property whereas the breach of contract claim is subject to the longer six-year statute of limitations. Accordingly, we hold there was no error in the trial court's refusal to dismiss the case outright.

B.

The Plaintiffs argue that the trial court erred in treating the conversion claim as barred. They argue that the claim did not accrue when the bank froze the accounts but only when, in 2006, the bank applied the funds in the accounts to its losses. Because the viability of the conversion claim might affect the remedies available to the Plaintiffs, we will briefly consider the issue even though we have held that the breach of contract claims were not time barred.

The statute of limitations for injury to property and conversion of property is found at Tenn. Code Ann. § 28-3-105. The pertinent parts state as follows:

> The following actions shall be commenced within three (3) years from the accruing of the cause of action:
>
> (1) Actions for injuries to personal or real property;
> (2) Actions for the detention or conversion of personal property.

This Court applied the statute in *Johnson v. Craycraft*, 914 S.W.2d 506 (Tenn. Ct. App. 1995), in a manner that answers the question of accrual in the present case. In the *Craycraft* case, Ms. Johnson entrusted her close personal friend, Craycraft, with much of her property, including her bank accounts. *Id.* at 507-08. Later, Ms. Johnson's son became interested in her affairs and persuaded her to sign a letter dated May 14, 1991, to Craycraft asking for an accounting and the transfer of some of the funds to a bank near the son's home in Florida. *Id.* at 508. Craycraft never responded. *Id*. Johnson then filed a complaint to recover her property. As relevant to the present dispute, we stated:

> The appellee contends that this case is one for conversion. He argues that the appellants' cause of action is barred by T.C.A. § 28-3-105, the three-year statute of limitations applicable to "[a]ctions for the detention or conversion of personal property." We disagree with his conclusion that this suit is time-barred.

Assuming, without deciding, that this is an action for conversion, we do not find that the evidence preponderates against the Chancellor's finding that the statute of limitations of three years "had not expired by the time this suit was filed." The period of limitations began to run "from the accruing of the cause of action." *See* T.C.A. § 28-3-105. The cause of action accrued "when the plaintiff knew or reasonably should have known that a cause of action existed." ***Stone v. Hinds***, 541 S.W.2d 598, 599 (Tenn. App. 1976).

The issue of accrual of a cause of action is basically a question of fact for the trier of fact. ***National Mortg. Co. v. Washington***, 744 S.W.2d 574, 580 (Tenn. App. 1987). By letter dated May 14, 1991, Johnson asked Craycraft for an accounting of her assets. A reasonable inference from that letter is that Johnson was unaware that Craycraft intended to exercise dominion and control over the property in question in a manner that was "inconsistent with the plaintiff's rights." *See **Mammoth Cave Production Credit Association v. Oldham***, 569 S.W.2d 833, 836 (Tenn. App. 1977). The evidence does not preponderate against the Chancellor's findings of fact as to the statute of limitations. The appellee's issue is found to be without merit.

*Id.* at 511 -512 (Tenn. Ct. App.1995)(footnote omitted). It is clear from ***Craycraft*** that once a property owner is aware that another is exercising dominion and control over its property in a manner that is inconsistent with the owner's rights, the cause of action for conversion has accrued.

In the present case, there was proof that the RDA became involved in cooperation with the Plaintiffs in trying to persuade Peoples to release the funds almost as soon as they were frozen. On September 10, 2003, RDA sent a letter to Peoples seeking release of the funds. Other, similar letters followed and were made exhibits. The bank did not respond to the letters, and in response to telephone calls only advised that the status had not changed. It is clear that the Plaintiffs, in August 2003 and no later than September 2003, were aware of actions by Peoples that were "inconsistent with [their] rights." ***Johnson***, 914 S.W.2d at 512.

C.

The Plaintiffs also argue that the bank is estopped to rely on the statute of limitations because of its assurances, through Mr. Reynolds, that the status had not changed. Even if such assurances fulfilled the elements of estoppel, which they do not, *see Northeast Knox Utility Dist. v. Stanfort Const.*, 206 S.W.3d 454, 461(Tenn. Ct. App. 2006), the assurances do not help the Plaintiffs' position. The Plaintiffs were, at most, being assured that Peoples was continuing to act in a manner inconsistent with their rights. We hold that the trial court did not err in finding the conversion claims accrued in August 2003 and were barred by the statute of limitations.

D.

We move now to Peoples' argument that the court erred in refusing to allow the setoff of accounts 1, 2, 3, 4 and 7. Again, we are unable to find any merit in the argument. With regard to accounts 1, 3, and 7, Peoples argues that Ayers was listed as the owner. We note that as to account 7, Peoples waived the issue when it conceded at trial that the account was primarily an account to hold tenant deposits in trust and that it had no proof that any funds owned or claimed by Ayers were in that account. *See Estate of Schultz v. Munford, Inc.*, 650 S.W.2d 37, 40 (Tenn. Ct. App. 1982) (holding that a party cannot take a position on appeal that is inconsistent with one taken at trial). *See also Wagner v. Citizens' Bank & Trust Co.*, 122 S.W. 245, 247 (Tenn. 1909)("The proposition that there is no right of set-off against a trust deposit, nor any lien for the trustee's personal debts, is axiomatic.")(internal quotation marks and citation omitted). With regard to accounts 1 and 3, we disagree with Peoples' position based on the facts of the case and the applicable standard of review. The trial court found that the entities, rather than Ayers, owned these accounts. The proof at trial was that Peoples "filled in the blanks" on the form Agreements. Account 1 only lists Ayers in terms of "C/O," meaning, in common parlance, the address for the entity is in care of Ayers. The other account, number 3, does contain the name of Ayers as owner, but only refers to him after specifically identifying "Village Apts LTD Taxes/Ins." in a blank that also called for the address of the account owner. Also, renewals drop the names of Ayers and other members of his family. In short, we have reviewed the record carefully and hold that the evidence does not preponderate against the trial court's findings.

The only argument advanced as to account 2 and 4 is that Ayers showed his ownership and dominion over these accounts, as well as all accounts, by using them as part of his criminal enterprise. We disagree. The trial court specifically discussed this possibility and reasoned that it was more likely the limited partners knew nothing about the scheme and did not consent to it. The proof at trial supports this conclusion. Peoples refers us to *Butler v. Buick Motor Co.*, 813 S.W.2d 454, 458 (Tenn. Ct. App. 1991) for the proposition that a thief

cannot acquire or convey title to stolen property. We find little need to struggle with this argument because it does not help Peoples. Once the Plaintiffs proved that the entities owned the accounts, it was incumbent upon Peoples to pursue its "stolen property" theory by tracing the identity of the stolen funds. The proof simply did not rise to that level. The proof, at most, allowed the conclusion that some time prior to the collapse, "kited" checks passed through some of those accounts. In the end, there were no bad checks that corresponded to losses in these accounts. The critical conclusions are that Peoples can only assert a right of setoff against "the account holder," or owner and that the entities rather than Ayers were the owners. We hold that the evidence does not preponderate against the trial court's treatment of accounts 1, 2, 3, 4, and 7 in holding that Ayers was not the owner and that the bank could not exercise setoff.

E.

We now deal with the Plaintiffs' argument that the trial court erred in sustaining the setoff on accounts 5 and 6. The thrust of the argument is that, even though the accounts were owned by Ayers, they were earmarked for a special purpose, known to the bank, making setoff unavailable. The Plaintiffs rely primarily on *In re Property Leasing & Management, Inc.*, 46 B.R. 903 (Bankr. E.D. Tenn. 1985), for their argument that special purpose accounts are not subject to setoff. The *Property Leasing* case involved a bankruptcy trustee's attempt to recover funds deposited in a bank and seized for setoff. The bankrupt party was a property management company that rented and managed property, took in rental payments, charged for its services, and remitted a portion of the funds taken in to the actual property owners. *Id*. at 906. The management company had an agreement with the property owners that it would not commingle the funds but would maintain a separate account for the amounts that were to go to the owners. *Id*. The bank knew the arrangement that the management company had with the property owners. *Id*. at 909. The management company utilized a general operating account and did commingle the funds. *Id*. The court held that the bank "would be entitled to set off funds in the account only to the extent that the account balance exceeded the amount due property owners." *Id*. at 910. The court reserved the ultimate issue for further proof of the amounts owed to property owners. *Id*. at n.2.

The *Property Leasing* opinion is obviously not binding on this Court, but even if it were, it does not carry the day for the Plaintiffs. In our view, the outcome in *Property Leasing* is adequately explained by the bankruptcy court's conclusion that the management agreement "established a trust fund for the benefit of property owners who were party to such agreements." *Id*. at 907. Since accounts 5 and 6 belonged to Ayers, *Property Leasing* is distinguishable from the present case with regard to accounts 5 and 6.

-19-

Also, as the party filing the declaratory judgment action and seeking return of the funds, the Plaintiffs bore the burden of proving that Peoples did not have a right to the funds in accounts 5 and 6. *See Blake v. Plus Mark, Inc.*, 952 S.W.2d 413, 417 (Tenn. 1997)(plaintiff in a declaratory judgment action retains the burden of proof). The *Property Leasing* opinion demonstrates that proof of a third party's generic claim to some funds in an account is not enough to carry that burden. Accounts 5 and 6 were the purported reserve replacement account and the taxes and insurance account for apartments owned by Ayers personally. There is no proof in the record as to the amount that was needed to pay the taxes and insurance or make updates and repairs on the complexes that Ayers owned personally. The proof is that Ayers established alternate accounts that satisfied the RDA and it did not hold him in default. Moreover, whereas the trustee in bankruptcy who prosecuted the case in *Property Leasing* was charged with preserving the rights of all creditors, including the property owners whom the management company owed, there was no assertion at the trial in this case of the rights of the RDA. Even though the RDA was named as a party by the Plaintiffs and appeared at the trial through counsel, they made it abundantly clear that they were not putting on proof or taking any position as to the rights of the parties. Counsel for the RDA told the trial court that it would reserve the right to later pursue Peoples and, if necessary, assert the federal government's "nanny-nanny-boo-boo defense." In fact, counsel for the Plaintiffs disclaimed any reliance on the RDA's rights and argued that it was the Agreement with the bank that controlled. He argued, "But it's not important what he agreed with the Government. He agreed with the bank and the bank agreed with him that they were deposited for a special purpose." The trial court carefully took this into consideration in rendering its opinion when it noted that if the RDA claimed rights in the accounts, it had not asserted those rights in this action. The evidence does not preponderate against the trial court's finding that Ayers used the funds in accounts 5 and 6 as his own and as he saw fit and that there was no material proof of the RDA's claim to the funds in accounts 5 and 6. Accordingly, we find no error in the trial court's finding that Peoples was entitled to exercise setoff against accounts 5 and 6.

F.

We now turn to the issue of whether the trial court erred in reducing the prejudgment interest. The thrust of the argument is that Peoples waived the issue by failing to object to the statutory maximum rate in its pleadings, by itself accepting the statutory rate in the judgment, and by failing to offer proof of the contract rate. The decision whether to grant a motion to alter or amend and the decision as to rate of prejudgment interest are both reviewed for abuse of discretion. *Stovall v. Clarke,* 113 S.W.3d 715, 721 (Tenn. 2003)(motion to alter or amend); *Hunter v. Ura*, 163 S.W.3d 686, 706 (Tenn. 2005)(prejudgment interest). The purpose of prejudgment interest is not to punish the wrongdoer, but to fully compensate the injured party for the loss of use of funds he or she

should have had even before the judgment was entered. *Id*. The ultimate question as to the interest is whether it is fair and equitable under the circumstance of the case. *In re Estate of Ladd*, 247 S.W.3d 628, 645 (Tenn. Ct. App. 2007).

Counsel for the Plaintiffs agreed with the trial court that "you do have . . . discretion [to reduce the interest rate] even after putting down that judgment at a higher rate." Also, counsel for Peoples accurately pointed out to the court that the record, even if it did not contain proof of the actual "contract rate," did include proof through the account statements that interest was being paid at an average rate of approximately 1%. In the same discussion, during the hearing on the motion to alter or amend, the trial court raised the possibility of reopening proof and supplementing the record. Counsel for the Plaintiff expressed a preference for "getting something down" in the form of a final judgment. We stop short of holding that the Plaintiffs waived these issues, but we construe counsel's actions and concessions as consistent with the trial court's reduction of the interest rate to 1%. We have fully considered the arguments and we conclude that the trial court did not abuse its discretion in amending its judgment to set prejudgment interest at a rate comparable to what was being paid on the accounts under the proof in the case.

G.

The final issue we consider is whether the evidence preponderates against the trial court's finding that Peoples sustained damages of $429,221.65. One argument the Plaintiffs make is that Peoples' only proof of the loss is through returned checks that it did not produce in discovery. As these checks were written on other banks and dishonored while in the hands of Peoples, we find it hard to believe that the Plaintiffs would not have received documentation, through some source, of the number and amount of these bad checks. There was also discussion in the record that the Plaintiffs were furnished the documents during the deposition of Mr. Reynolds. Even counsel for the Plaintiffs conceded that if the documents were withheld, it was not done intentionally. Moreover, the trial court noted that the documents were critical to Peoples' case and offered to consider a continuance. Counsel for the Plaintiffs elected to proceed. Under these circumstances, there was no abuse of discretion in the trial court's refusal to exclude the proof as a discovery sanction. *Pegues v. Illinois Cent. R. Co.*, 288 S.W.3d 350, 353 (Tenn. Ct. App. 2008)("Appellate courts review a trial court's decision to impose sanctions and its determination of the appropriate sanction under an abuse of discretion standard.").

Another argument the Plaintiffs make is that without proof of the debits and credits to the accounts, the bad checks prove nothing. We disagree. The bad checks all correspond to August 2003 when the accounts were frozen. It is clear that there was no money in the accounts to pay the checks when they were dishonored. It is logical to this court, as it was

logical to the trial court, though not without some explanation which benefitted both courts, that the bad checks correspond to the loss sustained. This was the substance of Mr. Reynolds' testimony. Reynolds was cross-examined vigorously and did not budge from his testimony as to the amount of the loss. The only proof offered to challenge Reynolds' testimony was the hearsay determination of Ayers' accountant, whom Ayers admitted did not even consider the stack of bad checks. In conclusion, we hold that the evidence does not preponderate against the trial court's finding as to the amount of damages.

V.

The judgment of the trial court is affirmed in all respects. In light of the fact that issues were raised and lost by both sides of this dispute, we exercise our discretion to tax the costs on appeal 50% to the appellant, Peoples Bank of the South, and 50% to the appellees, Bluff Springs Apartments, Ltd., Village Apartment, Ltd., and R.L.Ayers. This case is remanded to the trial court, pursuant to applicable law, for enforcement of its judgment and collection of costs.

_____<br>
CHARLES D. SUSANO, JR., JUDGE